IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| RONALD MASCARENA, | CV 18-121-BLG-DLC-JCL |
| Plaintiff, | |
| vs. | FINDINGS AND RECOMMENDATIONS OF UNITED MAGISTRATE JUDGE |
| RYAN KRAMER, OFFICER SCHWEIGRT, and BILLINGS POLICE DEPARTMENT, | |
| Defendants. | |

Pending before the Court are Defendants' Motions for Summary Judgment (Docs. 30, 34.)  Having considered the parties' arguments and submissions, the Court finds that there are no genuine disputes as to material facts regarding the merits of Mascarena's claims.  The motions for summary judgment should be granted and this matter should be dismissed.

## I.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Under summary judgment practice, "[t]he moving party initially bears the burden of proving the absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir.

2010) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving

party may accomplish this by "citing to particular parts of materials in the record,

including depositions, documents, electronically stored information, affidavits or

declarations, stipulations (including those made for purposes of the motion only),

admissions, interrogatory answers, or other materials" or by showing that such

materials "do not establish the absence or presence of a genuine dispute, or that

the adverse party cannot produce admissible evidence to support the fact."  Fed. R.

Civ. P. 56(c)(1)(A), (B).

 "Where the non-moving party bears the burden of proof at trial, the moving

party need only prove that there is an absence of evidence to support the non-

moving party's case."  *Oracle Corp.*, 627 F.3d at 387 (*citing Celotex*, 477 U.S. at

325); *see also* Fed. R. Civ. P. 56(c)(1)(B).  Summary judgment should be entered,

"after adequate time for discovery and upon motion, against a party who fails to

make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial."  *See*

*Celotex*, 477 U.S. at 322.  "[A] complete failure of proof concerning an essential

element of the nonmoving party's case necessarily renders all other facts

immaterial."  *Id.* at 323.  In such a circumstance, summary judgment should be

granted, "so long as whatever is before the district court demonstrates that the

2

standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.*

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11. "A plaintiff's verified complaint may be considered as an affidavit in opposition to summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence." *Lopez v. Smith*, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000) (en banc). The opposing party must demonstrate that the fact in contention is material, i.e., a fact "that might affect the outcome of the suit under the governing law," and that the dispute is genuine, i.e., "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

3

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all inferences supported by the evidence in favor of the non-moving party." *Walls v. Cent. Costa Cnty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586 (citations omitted).

By notices provided on May 31, 2019 (Docs. 33, 37), Mascarena was advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998)(en banc); *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988).

## II. ALLEGATIONS

In his verified Complaint, Mascarena alleged he was tackled without warning on a dead run by Officer Kramer for no good reason. He claimed he was brutally handled and Officer Kramer wrenched the cuffs too tight. When he asked what he was stopped for, he was not given a reason, and was cussed at installing fear. He alleged Officers Kramer and Schweigert drugged him and pushed him toward the car. Upon putting him sideways into the car, they did so in a manner

4

that caused his foot to be get stuck and then slammed the door on his left foot causing severe injury, even through his boots.  He claims that Officer Schweigert pulled too severely on his neck from behind because he was upset that he got his foot stuck in the door.  He alleged that as a result of this incident he suffered severe bruising on his right bicep and bruised, cracked, and sore ribs.  (Complaint, Doc. 2 at 6.)

## III.  UNDISPUTED FACTS[1]

On November 29, 2017, Mascarena was drinking and gambling at the Monte bar and casino in Billings, Montana.  (Kramer and Schweigert Statement of Undisputed Facts, Doc. 32 ("SUF") at ¶ 1.)  At some point, Mascarena's behavior changed dramatically and he became belligerent with the bartender and other patrons.  (SUF at ¶ 2.)  Mascarena disputes that he was on methampetimines, agitated, or drunk.  (Mascarena's response, Doc. 39 at 1.)  The bartender told Mascerena to leave, and Marscarena told the bartender to "f*** off."  The bartender then informed him that he would need to call the cops if Mascarena did not leave.  Mascarena said, "I don't do cops."  (SUF at 3.)  The bartender testified

---

[1]Local Rule 56.1 requires a party opposing a motion for summary judgment to file a statement of disputed facts addressing the moving parties' statement of undisputed facts. Mascarena filed a response to Defendants' motions in which he disputes certain facts but he did not file a statement of disputed of facts.  Although he has not technically complied with the Court's Local Rules, the Court has considered Mascarena's assertions in his response to the extent they are supported by the record.

that he dialed 9-1-1 and Mascarena yelled at him to hang up the phone or he would "come over the bar and f*** up your sh**." (SUF at ¶ 4.) The bartender was afraid for himself and his patrons, so he frantically looked for a bar knife behind the bar in case he needed it to defend himself. (SUF at ¶ 4.)

Mascarena then stormed out of the bar and headed north on 29th Street. (SUF at ¶ 6.) The bartender stepped outside of the bar and observed Mascarena walking away from the bar. (SUF at ¶ 6.)

At approximately 10:15 p.m., Officer Kramer with the Billings Police Department (BPD) was dispatched to the Monte for a report about a belligerent customer in the bar threatening the bartender and customers. (SUF at ¶ 12.) Kramer knew that it was reported that the suspect was intoxicated, using profanity, and physically fighting with customers who were attempting to get him out of the casino. (SUF at ¶ 13.) The suspect was described to Kramer as a male, white, 6 foot tall, 35-40 years of age, wearing blue jeans, brown boots, and a dark pullover. (SUF at ¶ 14.) Upon Kramer's arrival at the scene he went to the north entrance of the Monte, where the bartender identified Mascarena to him by pointing at him. Mascarena was walking north across First Avenue North at the time. (SUF at ¶ 15.) Kramer looked over and observed Mascarena who fit the suspect description he was given. (SUF at ¶ 16.)

6

Kramer told Mascarena, "Police, stop!"  (SUF at ¶ 17.)  Mascarena refused

to comply and continued to walk away from  Kramer.  (SUF at ¶ 18.)  Kramer

again ordered Mascarena to stop and he eventually complied.  (SUF at ¶ 19.)

Kramer observed that Mascarena appeared intoxicated and stood in a defensive

manner with his fists clenched.  (SUF at ¶ 20.)  Mascarena contends that Kramer

was cussing at Mascarena and Mascarena tried to cooperate and asked "what did I

do wrong, sir?"  (Mascarena response, Doc. 39 at 2.)

Due to Mascarena's refusal to leave the Monte (criminal trespass), as well

as threatening and intimidating behavior (disorderly conduct), Kramer advised

Mascarena that he was being detained and ordered him to put his hands behind his

back.  (SUF at ¶ 21.)  Mascarena refused to comply and proceeded to turn away

from Kramer.  Kramer considered him a flight risk and believed that he was

actively resisting arrest.  (SUF at ¶ 22.)  Kramer grabbed Mascarena by the arm

and again told him to put his hands behind his back.  Mascarena again refused to

comply and jerked his arm away.  (SUF at ¶ 23.)  After giving Mascarena a third

command to put his hands behind his back, he again refused to comply.  (SUF at ¶

24.)  Given that Mascarena was actively resisting arrest, Kramer pulled him onto

the ground onto his stomach, so that Kramer could protect himself from harm.

Kramer attempted to place Mascarena in handcuffs while he was on the ground.

(SUF at ¶ 26.)  Kramer struggled to gain control over Mascarena because his arms were flailing and he was pulling them away from Kramer.  Eventually, Kramer was able to get ahold of one hand at time to cuff each wrist individually.  (SUF at ¶ 27.)  Kramer double locked the handcuffs and ensured that they were properly fitted – not too tight.  (SUF at ¶ 28.)  He held Mascarena in that position until additional officers arrived at the scene to help.  (SUF at ¶ 30.)  During that entire time, Mascarena continued to yell profanity at Kramer and threatened him.  (SUF at ¶ 29.)

The bartender observed that Kramer is much shorter than Mascarena, which made it harder for Kramer to arrest him.  (SUF at ¶ 8.)  The bartender confirmed that Kramer had to struggle because Mascarena actively resisted arrest and refused to cooperate.  He observed Mascarena flailing, being aggressive, being highly agitated, and cussing. (SUF at ¶ 9.)

Officer Schweigert, another officer with the BPD was at the end of his shift, leaving the station when he overheard on the radio that an officer was dealing with an aggressive suspect at a bar and needed immediate assistance in front of the Monte.  (SUF at ¶ 31.)  Schweigert arrived at the scene, exited his patrol car and saw that Kramer had Mascarena detained on the ground across the street from the Monte.  (SUF at ¶ 32.)  Schweigert ran over to Kramer and Mascarena to assist in

the arrest of Mascarena.  (SUF at ¶ 33.)  When Schweigert got to Mascarena and

Kramer, Kramer had just placed handcuffs on Mascarena and was giving him

verbal instructions.  (SUF at ¶ 34.)

Kramer and Schweigert assisted Mascarena to his feet and attempted to

secure him in the back of a patrol car, so that he could be transported to the

Yellowstone County Detention Facility.  (SUF at ¶ 35.)  Mascarena refused to

walk on his own, i.e., made himself dead weight, so Schweigert and Kramer had to

take one arm each and physically assist him to the back seat of the patrol car.

(SUF at ¶ 36.)  Mascarena then refused to get into the patrol car on his own and

became physically and verbally aggressive.  His behavior was very erratic, which

made Kramer fearful for his own safety.  (SUF at ¶ 37.)  In order to get Mascarena

into the patrol car, Kramer had to pull him inside from the driver's side of the

vehicle, and Schweigert had to assist Mascarena inside the back of the vehicle

from the passenger side of the vehicle. (SUF at ¶ 38.)

As Schweigert attempted to get Mascarena into the patrol car, Mascarena

stiffened his legs and tried to kick at Schweigert with his boots.  (SUF at ¶ 39.)

Schweigert partially closed the car door and used it as a shield in an effort to

protect himself from being kicked until Kramer could pull Mascarena fully into

the vehicle from the other side.  (SUF at ¶ 40.)  Mascarena yelled that Schweigert

9

was closing the door on his foot, so Schweigert yelled at him to get his feet in the door, i.e., inside the vehicle.  When he refused, Kramer grabbed Mascarena from the driver's side of the vehicle and pulled Mascarena into the vehicle.  (SUF at ¶ 41.)  Schweigert pushed Mascarena's legs completely into the vehicle, so that the door would not close on his feet.  (SUF at ¶ 42.)  During that entire time, Mascarena continued to yell profanity at the Officers.  (SUF at ¶ 45.)

Based on their police training and experience, Kramer and Schweigert believe they used the minimal level of force that was necessary to affect Mascarena's arrest, especially in light of Mascarena's size (much taller than Kramer), aggressive, erratic, and threatening behavior, as well as the information Kramer received from the 911 dispatcher regarding the unpredictability and volatility of the situation.  (SUF at ¶¶ 46, 47.)

## IV.  OFFICERS KRAMER AND SCHWEIGERT

Defendants move for summary judgment dismissing Mascarena's claim of excessive force pursuant to the doctrine of qualified immunity.  Qualified immunity renders a law enforcement officer immune from liability when the officer's conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, ___ U.S. ___, 137 S.Ct. 548, 551, 196 L.Ed.2d 463 (2017) (citation and quotation omitted).

"In determining whether an officer is entitled to qualified immunity, we consider

(1) whether there has been a violation of a constitutional right; and (2) whether

that right was clearly established at the time of the officer's alleged misconduct."

*S.B. v. County of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017) (citation and

quotation omitted).  "These two prongs of the analysis need not be considered in

any particular order, and both prongs must be satisfied for a plaintiff to overcome

a qualified immunity defense." *Shafer v. County of Santa Barbara*, 868 F.3d

1110, 1115 (9th Cir. 2017).

Here, the Court will first consider whether the officers' conduct violated

Mascarena's constitutional rights and then whether it was a clearly established

right at the time of the arrest.

The Court notes that neither party has submitted evidence regarding the

status of the charges brought against Mascarena.  Defendants represent in their

brief that as a result of the incident at issue, Mascarena was charged with Criminal

Trespass to Property, Disorderly Conduct/Threats/Profanity, Obstructing a Peace

Officer, and Resisting Arrest, all while he was on probation and that a jury

convicted him of all charges.  (Brief, Doc. 31 at 4.)  However, there is no evidence

to support this statement and it is not included in the statement of undisputed facts.

Further, none of these convictions are listed on the Montana Department of

Corrections website.  https://app.mt.gov/conweb  Without actual evidence to support Defendants' representation that Mascarena was convicted of these charges, the Court feels compelled to analyze whether the initial stop and arrest of Mascarena were justified.  As such, the Court will analyze two issues.  First, is whether Defendants possessed the constitutional authority to arrest Mascarena and if so, whether they utilized excessive force in effecting that arrest.

### A.  Seizure

"For purposes of the Fourth Amendment, a seizure occurs when a law enforcement officer, by means of physical force or show of authority, in some way restrains the liberty of a citizen." *United States v. Chan–Jimenez*, 125 F.3d 1324, 1326 (9th Cir. 1997).  The Fourth Amendment provides protection against two types of seizures:  investigatory stops and arrests.  An investigatory stop or *Terry* stop under *Terry v. Ohio*, 392 U.S. 1 (1968), is a brief detention and interrogation and must be founded on reasonable suspicion.  *United States v. Miles*, 247 F.3d 1009, 1012–13 (9th Cir. 2001).  An arrest is a more intrusive detention and requires probable cause.  *Beck v. Ohio*, 379 U.S. 89, 91 (1964).

For a *Terry* stop to be lawful under the Fourth Amendment, the officer must have "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot[.]'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (*quoting Terry*,

12

392 U.S. at 30).  "The quantum of proof needed for reasonable suspicion is less

than a preponderance of evidence, and less than probable cause."  *United States v.*

*Tiong*, 224 F.3d 1136, 1140 (9th Cir. 2000).  Whether reasonable suspicion exists

for a *Terry* stop depends on the totality of the circumstances.  *United States v.*

*Arvizu*, 534 U.S. 266, 273 (2002).

Here it is clear that Officer Kramer had sufficient reasonable suspicion to

conduct a stop of Mascarena based upon the information provided by the

dispatcher via the bartender.  Kramer was advised that there was a belligerent

customer at the Monte who was threatening the bartender and customers.  (SUF at

¶ 12.)  He was advised that the suspect was intoxicated, using profanity, and

physically fighting with customers who were attempting to get him out of the

casino.  (SUF at ¶ 13.)  Mascarena matched the description of the suspect given to

Kramer.  (SUF at ¶ 14.)  Clearly Kramer had reasonable suspicion to initially stop

Mascarena.

The next issue is whether Kramer had probable cause to arrest Mascarena.

"Probable cause exists when, under the totality of the circumstances known to the

arresting officers (or within the knowledge of the other officers at the scene), a

prudent person would believe the suspect had committed a crime."  *Dubner v. City*

*and County of San Francisco*, 266 F.3d 959, 966 (9th Cir. 2001).  Reasonable

13

suspicion may ripen into probable cause based on events that occur after the initial investigative stop.  *United States v. Greene*, 783 F.2d 1364, 1368 (9th Cir. 1986) (*quoting United States v. Medina–Gasca*, 739 F.2d 1451, 1453 (9th Cir. 1984)).

It is clear that Kramer had probable cause to arrest Mascarena.  As Mascarena was walking away from the bar,  Kramer shouted, "Police, stop!"  Mascarena refused to comply and continued to walk away.  Kramer again ordered Mascarena to stop and he eventually complied.  Kramer observed that Mascarena appeared intoxicated.  Kramer justifies the detention based upon Mascarena's refusal to leave the Monte (criminal trespass), as well as threatening and intimidating behavior (disorderly conduct).  Further, when Kramer advised Mascarena that he was being detained and ordered him to put his hands behind his back, Mascarena refused to comply and turned away from Kramer.  At this point, Kramer believed Mascarena was a flight risk and believed that he was actively resisting arrest and he initiated the arrest.  Thereafter, Mascarena jerked his arms away from Kramer and refused to comply with Kramer's commands to put his hands behind his back.  (SUF at ¶¶ 17-22.)

Under Montana law, criminal trespass to property has three essential elements:  (1) a person knowingly; (2) enters or remains unlawfully in; (3) an occupied structure or the premises of another.  *State v. Robertson*, 2014 MT 279, ¶

14

19, 376 Mont. 471, 336 P.3d 367; Mont. Code Ann. § 45-6-203.  It had been

dispatched to Kramer that the Monte bartender reported that Mascarena was

threatening customers and the bartender, that he was intoxicated, using profanity,

and physically fighting with customers who were attempting to get him to leave.

Kramer therefore had probable cause to detain Mascarena for criminal trespass.  In

addition, Montana law provides that an individual commits the offense of

disorderly conduct if the person knowingly disturbs the peace by using

threatening, profane or abusive language.  Mont. Code. Ann. § 45-8-101.  It is

undisputed that Mascarena was using profanity and threatened the bartender and

other patrons at the Monte.  Kramer therefore had probable cause to detain

Mascarena for disorderly conduct.

As such, the Court finds that Defendants possessed the constitutional

authority to arrest Mascarena.  *See Atwater v. City of Lago Vista*, 532 U.S. 318,

354 (2001)(Fourth Amendment does not forbid a warrantless arrest for a minor

criminal offense).  An officer's authority to make an arrest "necessarily carries

with it the right to use some degree of physical coercion or threat thereof to effect

it." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

## B. Excessive Force

The next issue, then, is whether Defendants' use of force was excessive in

violation of Mascarena's right to be free from unreasonable seizures protected under the Fourth Amendment. *Graham*, 490 U.S. at 394-95. The Fourth Amendment prohibits an officer from exceeding "the bounds of reasonable force in effecting 'an arrest, investigatory stop, or other seizure.'" *Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1116 (9th Cir. 2017)(*quoting Graham*, 490 U.S. at 395-96).

Federal courts must analyze excessive force claims "according to the constitutional touchstone of objective reasonableness," and may not take into account an "officer's subjective 'intent or motivation.'" *Shafer*, 868 F.3d at 1116 (*quoting Graham*, 490 U.S. at 397). Thus, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them[.]" *Id*.

The determination of objective reasonableness requires the courts "to balance the 'nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Shafer*, 868 F.3d at 1116, (*quoting Graham*, 490 U.S. at 396). The courts have identified a non-exclusive list of three factors to consider when balancing the referenced competing interests: "(1) 'the severity of the crime at issue,' (2) 'whether the suspect poses an immediate threat to the safety of the officers or

16

others,' and (3) 'whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.'" *Id*.

Finally, a court must judge the reasonableness of the force used "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight[.]" *Shafer*, 868 F.3d at 1116, (*quoting Graham*, 490 U.S. at 396). The officer's perspective is necessary because officers "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397.

The Court finds that the nature and quality of the intrusion on Mascarena by the officers was not extreme. Mascarena alleges he was tackled without warning on a dead run by Kramer, he was brutally handled by Kramer, the handcuffs were wrenched too tight, he was cussed out, drugged to his car, his foot was slammed in the door, and that Schweigert pulled severely on his neck from behind. (Complaint, Doc. 2 at 6.) Despite these allegations in the Complaint, Mascarena has not disputed the vast majority of the sworn testimony and video evidence provided by Defendants in support of their motions for summary judgment. First, while Mascarena seems to dispute that he was severely intoxicated, the video evidence of him when he placed in the patrol car suggests he was intoxicated. *See*

17

*Scott v. Harris*, 550 U.S. 372, 379-380 (2007)(in considering a motion for summary judgment, courts have to view the facts in the light depicted by videotape which captured events underlying excessive force claim.)  The video evidence also demonstrates the Mascarena had to be drugged to the patrol car as he was not walking on his own.  Although his foot was briefly shut in the car door, the force does not appear to be excessive.  Further, the Court does not see how the efforts to pull Mascarena into the patrol vehicle could be considered excessive.

Further, there were countervailing governmental interests.  Mascarena had threatened the patrons and bartender at the bar to the extent that the bartender felt the need to search for weapon to defend himself.  His crimes cannot be considered minor.  Further, the Court views his actions as being a threat to the public and the officers.  Finally, the undisputed evidence demonstrates that Mascarena was resisting arrest.  He walked away from Kramer, he pulled his arms away from Kramer when Kramer was attempting to handcuff him, he refused to walk on his own, and he prevented the officers from shutting the car door.  It is undisputed that Mascarena attempted to kick Schweigert or at least the car's door as Schweigert was attempting to close the door.

Thus, when the Court balances the quality of the intrusion on the Mascarena's Fourth Amendment interests against the countervailing governmental

18

interests at stake, it finds that the use of force was objectively reasonable.

Even if Mascarena could establish Defendants used excessive force in violation of his Fourth Amendment rights under the foregoing analysis, Mascarena would still have to satisfy the second prong of the qualified immunity analysis. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (confirming the court has discretion in deciding which of the two prongs of the qualified immunity analysis to address first). Defendants would be entitled to qualified immunity if Defendants' conduct, in the context of the specific facts and circumstances of the encounter between Mascarena and Defendants, did not violate a clearly established constitutional right of which a reasonable officer would have known. *Kisela v. Hughes*, ___ U.S. ___, 138 S.Ct. 1148, 1152, 200 L.Ed.2d 449 (2018). The analysis focuses on whether a reasonable officer would have had fair notice, based upon the existing decisional law at the time of the officer's conduct, that the specific conduct in which the officer engaged in response to specific circumstances was unconstitutional. *Id.*

In assessing whether any particular right at issue was clearly established, the right may "not be defined at a high level of generality." *Whitey*, 137 S.Ct. at 552 (citation and quotation omitted). Rather, the established right "must be 'particularized' to the facts of the case." *Id*. (citation omitted). "Such specificity

is especially important in the Fourth Amendment context, where the Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.' " *Mullenix v. Luna*, ___ U.S. ___, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015) (citation omitted). A determination that a specific instance of the use of force was excessive can only be made based on the specific facts of each individual case. *Kisela*, 138 S.Ct. at 1153.

Although the Supreme Court does not require the existence of "a case directly on point" to create a clearly established right, "existing precedent must have placed the statutory or constitutional question beyond debate." *White*, 137 S.Ct. at 551 (citation and quotation omitted). "[P]olice officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela*, 138 S.Ct. at 1153. There must exist legal precedent involving similar facts that would give a reasonable officer fair notice that a particular use of force in particular circumstances is unlawful. *Id*. A court cannot conclude that an officer "violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Id*. (citation omitted). *See also Shafer*, 868 F.3d at 1117. Thus, qualified immunity protects "all but the plainly

20

incompetent or those who knowingly violate the law." *White*, 137 S.Ct. at 551
(citation and quotation omitted).

The Supreme Court has emphasized that to preclude the application of
qualified immunity a court must "identify a case where an officer acting under
similar circumstances as [the defendant] was held to have violated the Fourth
Amendment." *Shafer*, 868 F.3d at 1117 (*quoting White*, 137 S.Ct. at 552); *see
also S.B. v. County of San Diego*, 864 F.3d 1010, 1015-16 (9th Cir. 2017). Thus,
in this case the Court must find legal precedent that existed as of November 29,
2017, that would have put Defendants on clear notice that their conduct and the
degree of force they used upon Mascarena in the circumstances Defendants faced
constituted excessive force. *S.B.*, 864 F.3d at 1015.

As set forth above, it appears based upon the undisputed facts and the video
evidence that Kramer and Schweigert utilized minimal force to effect the justified
arrest on Mascarena. Even the Court can see that he was uncooperative and forced
the officers to drag him to the car, force his feet into the car, and physically pull
his body into the car. Although Mascarena alleged in his Complaint that the
handcuffs were wrenched too tight, he submitted no evidence to support this claim
and he did not dispute Kramer's testimony that the handcuffs were applied
properly. For the reasons discussed, the Court concludes Mascarena's rights in the

specific circumstances of his arrest, were not clearly established, and reasonable officers in Defendants' positions would not have known that their conduct towards Mascarena violated his constitutional rights.

Defendants Kramer and Schweigert's Motion for Summary Judgment (Doc. 30) should be granted.

## V.  CITY OF BILLINGS

Having found that there was no underlying constitutional violation, Mascerena cannot maintain a claim of municipal liability against the City.  *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).  Further, Mascerena has presented insufficient evidence to establish a claim for municipal liability.  To establish liability against a city, a plaintiff must show that his constitutional rights were violated pursuant to a policy, practice, or custom of the named entity. *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978); *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

Municipal liability under Section 1983 may not be predicated upon a respondeat superior theory of liability.  *Monell*, 436 U.S. at 694. That is, the City of Billings cannot be held liable just because its employees may have violated Mascerena's constitutional rights.  The City can only be held liable for an unconstitutional custom, policy, or practice which led to the alleged denial of

22

constitutional rights.

Mascerena presented no evidence of an unconstitutional custom, policy, or practice of excessive use of force.  The City's Motion for Summary Judgment (Doc. 34) should be granted.

Based upon the foregoing, the Court issues the following:

## RECOMMENDATIONS

1.  Defendants' Motions for Summary Judgment (Docs. 30, 34) should be GRANTED.

2.  The Clerk of Court should be directed to all close this matter and enter judgment in favor of Defendants pursuant to Rule 58 of the Federal Rules of Civil Procedure.

3.  The Clerk of Court should be directed to have the docket reflect that the Court certifies pursuant to Rule 24(a)(3)(A) of the Federal Rules of Appellate Procedure that any appeal of this decision would not be taken in good faith.

## NOTICE OF RIGHT TO OBJECT TO FINDINGS & RECOMMENDATIONS AND CONSEQUENCES OF FAILURE TO OBJECT

The parties may file objections to these Findings and Recommendations within fourteen (14) days after service (mailing) hereof.[2]  28 U.S.C. § 636.  Failure

---

[2]Rule 6(d) of the Federal Rules of Civil Procedure provides that "[w]hen a party may or must act within a specified time after being served and service is made under Rule 5(b)(2)(C)

to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

This order is not immediately appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to Fed.R.App.P. 4(a), should not be filed until entry of the District Court's final judgment.

DATED this 17th day of July, 2019.


  _/s/ Jeremiah C. Lynch_____
  Jeremiah C. Lynch
  United States Magistrate Judge

---

(mail) . . . 3 days are added after the period would otherwise expire under Rule 6(a)."  Therefore, since Mascarena is being served by mail, he is entitled an additional three days after the period would otherwise expire.